**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 10-CR-186-CVE** |
| | ) | |
| **JOSE LUIS PULIDO,** | ) | |
| **ALBA LORENA NAJAR,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Now before the Court are motions to suppress filed by defendants Jose Luis Pulido and Alba Lorena Najar (Dkt. ## 38, 40), and a motion in limine filed by defendant Pulido (Dkt. # 39). The government filed responses in opposition to both the motions to suppress and the motion in limine. Dkt. ## 41, 42. A suppression hearing was held on January 31, 2011.

**I.**

In the early morning of November 8, 2010, Pulido was driving a white conversion van with New York state license plates on the Will Rogers Turnpike (I-44) in Craig County, Oklahoma, in the Northern District of Oklahoma. Dkt ## 38, at 1; 41, at 1. Najar was a passenger in the van. Id. Oklahoma Highway Patrol Trooper Branson Perry was on patrol in that area, and observed the van fail to signal a lane change. Id. Perry then conducted a traffic stop of the van.[1]

---

[1] The traffic stop was recorded on Perry's vehicle's recording device. The video and a transcript of the stop were provided. See Dkt. # 41-1. Because the video itself does not have a time stamp, the timing of events is based on the media player's program timer. The traffic stop does not begin until approximately a minute and a half into the recording, because Perry turned on the recording device after he observed the van fail to signal a lane change but before he effected a stop of the van.

After stopping the van, Perry returned with Pulido to the patrol car. Perry informed Pulido that he was going to give him a warning only, and that it would not cost him any money. While writing the warning, Perry began questioning Pulido as to where he was going, how long he was going to be there, and who he was going to see. Dkt. # 40, at 1-2. Pulido said that he was a contractor, that work had been slow, and that he was traveling to Indiana on vacation. Dkt. # 41, at 1. Approximately one minute and 50 seconds into the conversation, Pulido received a phone call. He answered and conducted a conversation in Spanish. Dkt. # 41, at 1-2. Pulido told Perry that the call came from the passenger of the van. Id. at 2. At that point, Perry asked Pulido several questions about the passenger. When asked for her name, Pulido told Perry that it was "Alba Fuentes." Approximately two minutes into the conversation, Perry asked Pulido who owned the van. Pulido said that it was owned by his friend, but could not recall the friend's name. Id.; Dkt. # 41, at 2. Perry and Pulido continued to discuss his travel plans and association with the owner of the van.

Approximately five minutes after the stop began, Perry called in a records check on Pulido. Nine minutes into the stop, another trooper arrived, and Perry requested that he obtain identification from Najar. Dkt. ## 40, at 2; 41, at 4. Due to Najar's difficulty understanding English, Pulido was asked to call her to tell her what the officers needed. At that point, Pulido stated that she did not have a phone, and that the earlier call had not come from her. Perry then questioned Pulido abut his inconsistent statements. During that time, the other trooper was able to obtain identification from Najar. The identification revealed that her last name was not "Fuentes," and Pulido claimed that Najar had lied to him about her name. Dkt. # 41, at 2. Approximately fourteen minutes into the stop, Perry completed the warning citation and handed the paperwork and Pulido's identification to him. Id.; Dkt. # 41, at 2. Perry did not advise Pulido that he was free to leave. Dkt. # 40, at 2.

Approximately fifteen minutes after the stop began, Perry asked Pulido if he could ask him a few questions, and Pulido consented. Dkt. # 41, at 2. After denying that there were any drugs or guns in the van, Pulido gave his consent for Perry to search the van. Id. Perry then left his patrol vehicle to search the van. Dkt. # 41, at 2. During Perry's absence, Pulido received a phone call and stated that he was "trapped in [the patrol car]."[2] Perry returned to the patrol car with Najar and left both defendants in the car for the duration of the search.[3] Perry told Pulido that if he required contact during the search, he should honk the horn in the patrol car. Dkt. # 40, at 2.

About 31 minutes and 45 seconds after the stop began, Perry discovered approximately eight kilograms of cocaine and approximately eight kilograms of heroin in an electronically controlled "trap" compartment beneath the rear seats of the van. Dkt. # 41, at 3. Pulido and Najar were arrested for possession of cocaine and heroin with intent to distribute, and indicted for the same on December 7, 2010. Dkt. # 41, at 2.

---

[2]  Because Pulido's remarks were in Spanish, the Court relies on the government's translation of the conversation. Dkt. ## 38-1; 40-1.

[3]  The conversation in Spanish between the two defendants while in the patrol car was recorded on Perry's vehicle's recording device, and a transcript of the conversation and video were provided. See supra., note 1.

## II.

Defendants[4] seek to suppress the evidence found in the search of the van as the fruit of an illegal detention. They challenge the government's conduct on two bases. First, they argue that Perry impermissibly prolonged the traffic stop during his questioning of Pulido in the patrol car prior to Pulido's consent to search. Second, they argue that Pulido's consent to search was not voluntary. Therefore, defendants allege that the detention and search violated their constitutional rights.

### A. Traffic Stop

A traffic stop is treated as an investigative detention, and is governed by the standards set forth in Terry v. Ohio, 392 U.S. 1 (1968). United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). When determining the reasonableness of a traffic stop, a court must make two separate inquiries. The first question is whether the officer's action was justified at the inception of the stop. United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995). Second, a traffic stop must not become an unnecessarily lengthy detention, but must be limited in scope to the purpose of the initial traffic stop. United States v. Rice, 483 F.3d 1079, 1083 (10th Cir. 2007). A police officer may extend the length of the traffic stop for questioning beyond the initial purpose of the traffic stop only

---

4 As a passenger in Pulido's van, Najar has standing to challenge the traffic stop. See United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989). She lacks standing to challenge the ensuing search, as she has not presented any evidence as to a "subjective expectation of privacy in the area searched" that society is prepared to recognize as objectively reasonable. Id. However, if the traffic stop is found to be improper, the "fruit of the poisonous tree" doctrine may still dictate exclusion of evidence discovered during the search. Id. at 272. The government has not challenged Najar's standing.

if the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred, or the driver voluntarily consents to further questioning." United States v. Ramirez, 479 F.3d 1229, 1243 (10th Cir. 2007).

**1. Scope of the Traffic Stop**

The parties do not dispute that the traffic stop was based on Pulido's failure to signal a lane change and was, therefore, justified at the inception. However, the Court must also consider whether the length of the traffic stop was reasonable under the second prong of Terry. An officer conducting a traffic stop may request a driver's license and registration, run a computer check, and issue a citation. See United States v. Zubia-Melendez, 263 F.3d 1155, 1161 (10th Cir. 2001). An officer may also "ask questions about the motorist's travel plans and authority to operate the vehicle," in addition to obtaining the relevant documentation, without exceeding the scope of an investigative detention. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). Such questioning does not violate the Fourth Amendment as long as the questioning does not prolong the traffic stop. Villa, 589 F.3d at 1339; United States v. Wallace, 429 F.3d 969, 974 (10th Cir. 2005).

After stopping Pulido, Perry brought him to the patrol car. Perry initially questioned Pulido only about his travel plans. Approximately two minutes after entering Perry's vehicle, Pulido received a phone call. Pulido told Perry that the call came from the passenger in his vehicle, who Pulido identified as "Alba Fuentes." Dkt. # 41-1, at 3. At that point, Perry asked Pulido questions about the passenger. Perry then proceeded to ask about ownership of the van and how Pulido came to be driving it. Approximately five minutes after Perry initiated the stop, he radioed in Pulido's name, date of birth, and license number. While waiting for the license check, Perry continued questioning Pulido about the owner of the van.

Nine minutes into the conversation between Pulido and Perry, a second officer arrived. Dkt. # 41-1, at 5. Perry requested that the second officer get identification from the passenger in the vehicle. When notified by Pulido that the passenger did not speak English, Perry asked Pulido to call the passenger from the phone that he had with him. Pulido replied that the passenger did not have a phone, at which point Perry questioned Pulido for approximately one minute about his previous statement that the phone call he received was from the passenger. The second officer was able to obtain identification from the passenger during that time, which revealed that her last name was not Fuentes. Id. at 6. Perry then questioned Pulido about his previous statement regarding the passenger's last name, and Pulido told Perry that Najar had lied to him about her name. Id. Perry asked again about Perry's relationship with the passenger. He then handed back to Pulido the identification cards belonging to him and Najar. Perry asked a few additional questions about the owner of the van, and gave Pulido the warning citation. After handing Pulido the citation, Perry asked if he could ask Pulido another question. Pulido agreed, and Perry asked him if he had anything illegal in the van, such as guns, beer, or drugs. Id. at 7. Pulido said he did not, and Perry then asked if he could search the van. Pulido gave his permission, and Perry asked him to stay in the car. In all, the exchange between Perry and Pulido in the patrol car lasted approximately fifteen minutes.

The government argues that Perry's questioning of Pulido was within the proper scope of the traffic stop. Defendants argue that Perry's questioning artificially prolonged the traffic stop because his conversation with Pulido extended the amount of time that it took him to write the warning, and that the questioning was therefore improper. At the outset, the exchange between Perry and Pulido can be divided into three parts: the time period when Perry and Pulido were talking prior to the arrival of the second officer, the period between the second officer's arrival and the point at which

Perry returned Pulido's license and warning citation, and the period after Perry gave those documents to Pulido but continued to question him.

During the first period, Perry questioned Pulido while writing the warning and waiting for a response on the license check. Defendants make much of the fact that Perry's questioning of Pulido continued beyond the amount of time that it would take merely to write a citation. However, the length of the total traffic stop, approximately fifteen minutes, was not excessive. See United States v. Montes, 280 F. App'x 784, 789 (10th Cir. 2008)(unpublished)[5]("the total time of the traffic stop . . . – fifteen minutes – is within the range of what we have approved for a routine warning stop"). The subject matter of Perry's questioning was also proper. First, Perry's questioning about Pulido's travel plans is within the scope of a valid traffic stop. See Alcaraz-Arellano, 441 F.3d at 1258. The questions about Najar, the vehicle's passenger, were also within the proper scope of a traffic stop. See United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007)(noting that an officer may ask for identification from passengers and run background checks on them in course of a traffic stop, and citing United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), for proposition that "officer can legitimately ask questions about the identity of passengers during a traffic stop"). Questions about the ownership of the van and Pulido's authority to drive it were also permissible. See Alcaraz-Arellano, 441 F.3d at 1258. Finally, calling in the license check was within the scope of the traffic stop, and waiting for a response did not impermissibly extend the stop. Id. at 1259. Thus, Perry's questioning during the first nine minutes of the conversation did not impermissibly extend the stop.

---

5 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

During the second period, Perry learned of several inconsistencies in what Pulido had previously told him. He then questioned Pulido about both his prior statement that the passenger had called him, and about his prior statement regarding the passenger's name. The Tenth Circuit has not explicitly spoken as to whether attempts by officers to resolve inconsistencies that result from answers to permissible questions expand the scope of a traffic stop. Instead, such inconsistencies are generally discussed in the context of providing reasonable suspicion to search or question a defendant. See, e.g., United States v. Simpson, 609 F.3d 1140, 1149 (10th Cir. 2010)(internal quotations omitted); United States v. Karam, 496 F.3d 1157, 1165 (10th Cir. 2007). Although Perry's questioning of Pulido regarding inconsistencies in his statements could be characterized as an attempt merely to clarify information about the passenger, Perry focused in large part on seeking an explanation as to why Pulido had fabricated information. If that explanation was the focus of Perry's questions, the questioning may have exceeded the purpose for the traffic stop and prolonged it for a short period of time. However, as explained below, even if the questions are assumed to have prolonged the stop for an unreasonable period, the expansion of the traffic stop was justified by reasonable suspicion.

Finally, the questions about illegal items in the van that Perry asked Pulido during the third period of time were beyond the scope of the traffic stop. Once an officer returns a driver's license and citation and the purpose of the traffic stop is concluded, the driver must be allowed to proceed without further delay. United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994).

Questions prolonging the stop after that point are justified only by consent or reasonable suspicion. As noted, Perry's questions were justified by reasonable suspicion.[6]

**2. Reasonable Suspicion**

Police must have reasonable suspicion that criminal activity is afoot to continue a traffic stop beyond the purpose of issuing a warning or citation for the traffic violation. United States v. Kopp, 45 F.3d 1450, 1453 (10th Cir. 1995). Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996)(internal quotations omitted). An "inchoate and unparticularized suspicion or 'hunch' is insufficient" to support reasonable suspicion. United States v. Hall, 978 F.2d 616, 620 (10th Cir. 1992)(internal quotations and citations omitted). Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." Alcaraz-Arellano, 441 F.3d at1260 (quoting United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997)). In determining whether an officer had reasonable suspicion of criminal activity, the Court does not evaluate the facts in isolation but instead construes them together based on the totality of the circumstances. United States v. Arivizu, 534 U.S. 266, 274 (2002). An officer must point to objective facts that justify his suspicion that a person stopped is engaged in criminal activity.

Perry testified that, during the course of the initial stop, he observed the following behaviors that contributed to his suspicion that defendants were engaged in criminal activity:

1. The driver and passenger had frightened looks on their faces.

---

6 Pulido also consented to the additional questions asked by Perry. Dkt. # 41-1, at 7. The parties did not address the validity of Pulido's consent to additional questioning.

2. The passenger was in the rear seat with her hands in a praying position.

3 There was very little luggage present for a long trip.

4. The driver's stress never decreased, even though he was advised that he would receive only a warning.

5. The driver responded with "huh" when asked where he was going.[7] He then said he was going to Indiana to see family.

6. The driver's voice was shaky and air was being forced out of his lungs. According to Perry, those are stress-related behaviors.

7. Pulido said that his work was slow, and that he was on vacation for a week or two.

8. Within a few minutes of the stop, Pulido received a phone call. Pulido advised that it was from the passenger.

9. When asked the passenger's name, Pulido hesitated slightly, as if he wasn't sure.

10. Pulido was shifting and fidgeting in the seat in the patrol car.

11. Pulido nervously asked when it snowed [in Oklahoma].

12. Pulido's heart rate was elevated, he rubbed his neck, arms, and hair, his voice was shaky, and he had a dry mouth.

13. Pulido could not state who owned the van, but only that it was a friend with a "funny Dominican name."

14. When asked how he got the van, Pulido gave a nonsensical response.

15. Pulido's explanation for the trip, to retrieve his truck in New York, was confusing.

---

7 Defendant's initial response may have been a reaction to his inability to understand the colloquial "Where are you headed?" first used by Perry. When then asked "Where are you going?," defendant responded directly. Dkt. # 41-1, at 2.

16. Pulido stated that Najar lied to him about her name.

17. When Perry shook Pulido's hand, it was covered in perspiration.

18. Pulido lied about the person from whom he received a phone call while in Perry's vehicle.

These factors can mostly be categorized as misinformation given to the officer (## 8, 9, 16, 18), discrepancies in travel plans or information about the trip (## 5, 7, 13, 14, 15), and behaviors of stress or nervousness on the part of Pulido (## 1, 4, 6, 10, 11, 12, and 17). The remaining factors – the passenger's praying position and the lack of luggage – will be considered separately.

**a. Misinformation given to officer**

"[L]ies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion." Simpson, 609 F.3d at 1149; see also United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997)("inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity"); cf. Santos, 403 F.3d at 1132 (noting that defendant's false denial of his criminal history was "the most powerful reason" for sustaining the finding of reasonable suspicion).

Pulido received a phone call within the first two minutes he was in the patrol car. Pulido told Perry that the call had come from the passenger in his vehicle. However, when Perry later asked Pulido to call the passenger to assist in obtaining her identification, Pulido replied that she did not have a phone with her. Dkt. # 41-1, at 5. Moreover, he claimed at that point that he had not said the first call came from her, and proceeded to make a number of confusing statements about the prior call. Id. at 6. It is clear from the transcript and video of the traffic stop that Pulido originally stated that the call came from the passenger. Further, Pulido first told Perry that the passenger's last name

was Fuentes. Id. at 3. When her identification revealed that statement to be incorrect, Pulido stated that she had lied to him about her name. Id. at 6. Although Pulido provided an explanation for his mistake by stating that Fuentes was her ex-husband's name, Dkt. # 41-1, at 6, "a factor may not be completely ignored simply because it is susceptible of innocent explanation." Arvizu, 534 U.S. at 276-77. The inconsistencies and misinformation from Pulido are a significant factor in creating reasonable suspicion on the part of Perry that defendants were engaged in criminal conduct.

**b. Discrepancies in travel plans or information about the trip**

Vague, inconsistent, or evasive answers with respect to travel plans may also be relied upon to support an officer's determination that reasonable suspicion existed. See Simpson, 609 F.3d at 1148-50; Karam, 496 F.3d at 1164-65. Here, Pulido first told Perry that he was a contractor, that work had been slow, and that he was on vacation to Indiana to see family. Dkt. # 41-1, at 2. Describing how he came to be driving the van, Pulido vaguely stated that some individuals, who he did not name, had gone to California to "do some things," and that they had then driven Pulido's truck back to New York. Id. at 4. He said that after spending a few weeks in Indiana, he was going to go to New York to retrieve his truck. Id. at 4. He then said that he would drive the truck back to California. Id. He stated that he was making the trip at that time because he did not have much work, and that in December he would probably have to go to Mexico to see his parents. Id. Pulido first said that the van was owned by his friend. Id. at 3. However, he was unable to recall the name of the owner, and later said he had known the owner about three months. Id. at 4. He said he knew the owner through other people, including the passenger of the van. Id. at 4-5.

Contradictions and inability to supply an officer with basic information about a trip have been found to contribute to reasonable suspicion in an experienced officer. E.g., United States v. Santos,

403 F.3d 1120, 1130-31 (10th Cir. 2005); United States v. Mendez, 118 F.3d 1426, 1431-32 (10th Cir. 1997). However, courts may not rely on inconsistencies caused only by an explainable lack of familiarity with details, and travel plans that are merely unusual, rather than implausible, do not contribute to reasonable suspicion. See Simpson, 609 F.3d at 1149 (noting that courts may not weigh as part of the reasonable suspicion analysis travel plans that are plausible but reflect choices that the typical traveler would not make); Santos, 403 F.3d at 1130-31 (fact that defendant did not know facts such as a family phone number or the ages of his nieces and nephews was insufficient to support reasonable suspicion). Pulido's explanation as to the purpose for his trip was convoluted. That may be due in part to the defendant's use of English as a second language, and the Court will not rely on slight discrepancies in the telling of his story or in the timeline he described. Moreover, although Pulido did not state when first asked about his trip that he was eventually going to New York, that additional trip could be read to be consistent with his original statement that he would be in Indiana for one or two weeks.

However, even if some discrepancies are overlooked for reasons of the language barrier and merely unusual travel plans, not all of Pulido's statements may be so easily explained away. His explanation for how the van came into his possession was confusing and lacking in any detail. Further, the name of the owner of the van Pulido was driving is the kind of fact that Pulido could be expected to know, and the unclear nature of the relationship between Pulido and the owner raised suspicion in Perry's mind. Pulido's inability to provide facts about the people to whom he was willing to entrust his own vehicle similarly contributed to reasonable suspicion. Given the inconsistencies and lack of detail, Pulido's statements regarding his travel plans taken as a whole are properly a factor in the reasonable suspicion analysis.

c. **Nervousness**

Extreme nervousness of a driver or passenger, in combination with other factors, may factor into reasonable suspicion to continue a traffic stop beyond its initial purpose. United States v. Montes, No. 09-2269, 2010 WL 4263308, at * 3 (10th Cir. Oct. 29, 2010)(unpublished)[8]. However, "nervousness is of limited significance in determining whether reasonable suspicion exists." Simpson, 609 F.3d at 1147. While "[e]xtreme and persistent nervousness . . . 'is entitled to somewhat more weight,'" a court may not rely solely on a police officer's perception of nervousness, but must instead find objective indicators of extreme nervousness. Id. at 1148.

Here, Perry noted that he observed physical indicia of stress on the part of Pulido. He states that Pulido's stress did not decrease even when he was advised that he would receive only a warning, his voice was shaky, he was shifting nervously, his heart rate was elevated, he rubbed his neck, arms, and hair, he had a dry mouth, and his hands were covered in perspiration. Perry further observed that Pulido and Najar had frightened looks upon their faces when stopped, and that Pulido asked a nervous question about the weather. The Court's review of the video of the encounter supports Perry's stated observations of nervous behavior on the part of Pulido. Pulido's movements show that his mouth was very dry, and he repeatedly touched his chest and arms. He paused before answering a number of questions, made somewhat erratic hand gestures, and inserted an unrelated question about the weather in the middle of the conversation. Perry also testified that Pulido's heart rate was

---

8 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

elevated,[9] and that his hands were covered in perspiration. The Court is mindful of its responsibility to "judge the officer's conduct in light of common sense and ordinary experience but also to grant deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." United States v. Lopez, 518 F.3d 790, 797 (10th Cir. 2008). Pulido engaged in a number of behaviors that reasonably created an impression of nervousness in Perry's mind. Thus, although the Tenth Circuit has dictated a limited approach to nervousness, the Court will give slight weight to Perry's assessment of nervousness as a factor in the reasonable suspicion analysis.

### d.    Other factors

Perry also cited Najar's "praying position" in the back seat of the van and the lack of luggage as factors contributing to reasonable suspicion. Passenger behavior has been recognized as a relevant factor in determining the existence of reasonable suspicion. E.g., United States v. Clarkson, 551 F.3d 1196, 1202 (10th Cir. 2009). While the Tenth Circuit has not addressed whether a praying position assumed by a defendant during a stop is a valid factor in the reasonable suspicion analysis, another circuit court of appeals has determined that a defendant's assumption of a praying position during a traffic stop contributed to probable cause to search the vehicle. See United States v. Frazier, 194 F. App'x 694, 701 (11th Cir. 2006)(unpublished)[10]. Although the mere fact that an officer observes an occupant of a car in a praying position seems very near to the type of fact that "must be

---

[9]     Perry testified that he based his observation of Pulido's elevated heart rate on the visible beating of the carotid artery in his neck. That artery is not visible on the video. However, the clothing that Pulido was wearing at the time of the stop would have permitted such an observation by Perry.

[10]     Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous,"

Simpson, 609 F.3d at 1147, when combined with other factors, it may play a very small part in the

reasonable suspicion analysis.

Similarly, the Tenth Circuit has found that luggage insufficient for the stated duration of a

trip may contribute to reasonable suspicion. See, e.g., United States v. Lopez-Gutierrez, 334 F.

App'x 880, 883 (10th Cir. 2009)(unpublished)[11]; United States v. Powell, 277 F. App'x 782, 787

(10th Cir. 2008)(unpublished)[12]. On Perry's approach of the van, he shined a flashlight into the back

and middle sections, and observed very little luggage. In light of Pulido's later statement that his

trip would last one to two weeks, Perry found the lack of luggage to be indicative of criminal

conduct. Such an observation by an officer can also factor in to the reasonable suspicion analysis.

The misinformation from Pulido to Perry, the inconsistencies in Pulido's stated plans, and

Pulido's inability to recall basic facts about his travel, are all factors that could have properly created

a particularized and objective basis for suspecting the person stopped of criminal activity.

Additionally, slight weight may be given to observed nervous behavior on the part of Pulido, to the

praying position adopted by Najar, and to the minimal luggage in the vehicle. Based on those

factors, there was an objectively reasonable basis for Perry to suspect that criminal conduct was

occurring. Any prolonging of the traffic stop beyond its initial purpose to ask Pulido additional

questions was therefore justified.

---

[11]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

[12]    Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

### B. Voluntariness of Consent

As noted, Perry's continued questioning of Pulido following the end of the traffic stop and return of his documents was justified by reasonable suspicion. After asking a few additional questions, Perry asked Pulido, "can I search in the van?," and Pulido replied, "sure, you can do whatever you want." Dkt. # 41-1, at 7. Warrantless searches of motor vehicles are valid only where an officer has probable cause, or where another exception to the warrant requirement is present. United States v. Contreras, 506 F.3d 1031, 1036 (10th Cir. 2007). "Voluntary consent is a well-recognized exception to the Fourth Amendment's warrant requirement." United States v. Gomez-Acuna, 375 F. App'x 809, 814 (10th Cir. 2010)(unpublished)[13]. The government bears the burden of proof as to voluntariness, and must show that "there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993).

"The central question in determining whether consent to a search is voluntary is whether the police would have communicated to a reasonable person that the person was not free to decline the officers' request." Contreras, 506 F.3d at 1036. "In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules." United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997). Thus, "a court must consider all the circumstances surrounding the encounter to determine" whether a reasonable person would have felt "free to decline the officers' requests or otherwise terminate the encounter." Id. at

---

13 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

814. Pulido[14] argues that his consent to search the van was not freely given because, based on the totality of the circumstances, including the presence of two officers and Perry's failure to inform him that he was free to go, he did not feel free to terminate the encounter. E.g., Dkt. # 40, at 4-5. He further claims that his mindset at the time is confirmed by his statement during a phone call that he was "trapped" in the patrol car. Id. Finally, he argues that the fact that he was not free to leave is shown by Perry's instruction to Pulido to honk the car horn if he needed anything while Perry was conducting the search. Id.

The Tenth Circuit has consistently held that return of a defendant's documents is necessary to transform a traffic stop from an investigative detention to a consensual encounter. Elliott, 107 F.3d at 814; see also Soto, 988 F.2d at 1557. However, return of documents alone is not sufficient to demonstrate that a traffic stop has terminated, and courts must look for other factors that might lead a defendant to conclude he was not free to terminate the encounter. Elliott, 107 F.3d at 814. Factors considered in assessing whether a reasonable person would feel free to leave include coercive show of authority, "such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." Id. (citing United States v. Turner, 928 F.2d 956, 959 (10th Cir. 1991)). However, provided that an officer has not made such a show of authority, the fact that the officer does not instruct a driver that he is free to leave does not prevent a finding that the subsequent encounter is consensual. Id. (finding defendant's consent to search voluntary when given after documentation was returned to her and officer made no sign of any coercion, regardless of fact that officer did not inform defendant that she was free to leave). Nor does the fact that an encounter takes

[14] As noted, Najar lacks standing to challenge Perry's search of the vehicle.

place in the presence of an armed officer while a citizen is in the back of a police car render it automatically nonconsensual. See Villa, 589 F.3d at 1340.

Here, Perry handed the identification cards for Pulido and Najar to Pulido, and gave him the warning citation. At that point, although Perry did not instruct Pulido that he was free to leave, the video of the encounter shows that Perry and Pulido shook hands, and that Pulido made a movement to exit the patrol car. Perry's request at that point to ask another question, and then to search the car, was nonthreatening and done in the conversational tone that Perry and Pulido had maintained throughout the encounter. The fact that defendants were stopped on the side of an interstate highway, a highly public area, weighs in favor of voluntariness.[15] See Soto, 988 F.2d at 1558. Although there was another officer present, he was not near Perry and Pulido at the time Pulido gave consent, and he had not behaved in a threatening or intimidating manner. Finally, Pulido's response to Perry – "sure, you can do whatever you want" – was wholly unequivocal in granting consent to search.

Although Pulido argues that his later comment that the police had him "trapped" confirms that he did not feel free to terminate the encounter, the voluntariness inquiry is based on whether Pulido had an "objectively reasonable belief that he was not free to leave or disregard [Perry's] search request." See United States v. Pulido-Vasquez, 311 F. App'x 140, 144 (10th Cir. 2009)(unpublished)[16]. Thus, even assuming that Pulido's statement presents an accurate picture of his mindset at the time, a defendant's statement to another about his ability to leave does not

---

15 The fact that Perry's stop of defendants occurred late at night lessens the significance of the stop occurring in a public place.

16 Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

contribute to the voluntariness analysis.[17] Neither is Perry's instruction to Pulido regarding how Pulido should make contact during the search relevant to whether Pulido's consent to that search was voluntary. Based on the totality of the circumstances, including the fact that Perry returned Pulido's documents, Perry and Pulido shook hands, Pulido began to leave, Perry maintained a conversational tone, Pulido gave an unequivocal response to the request, and there was an absence of coercive circumstances, the Court finds that Pulido's consent was freely and voluntarily given, and the search of the van was therefore valid. Defendants' motions to suppress the evidence obtained as a result of the search are denied.

## III.

Defendant Pulido also filed a motion in limine to exclude testimony from Perry regarding the factors that led him to believe that defendant was engaging in criminal activity. Dkt. # 39. In a report written following his stop of defendants, Perry described a number of behaviors that he viewed as indicative of criminal activity. Pulido argues that because an opinion or inference of criminal activity is not that of a lay witness, Perry may not testify as a lay witness under Federal Rule of Evidence 701.[18] Id. at 2. Instead, Pulido argues that his testimony is properly that of an expert

---

17 This is particularly the case where, as here, a defendant may have had self-serving reasons for making the statement. A review of the entire transcript reveals that the call was likely from another individual nearby on the road, and that Pulido may have had reason to prefer to characterize himself as "trapped" rather than admit to having given consent to search.

18 Federal Rule of Evidence 701 states that a lay witness may testify "in the form of opinions or inferences . . . which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

under Federal Rule of Evidence 702.[19] Id. at 2-5.  Moreover, he argues that such testimony is inappropriate because it "embraces an ultimate issue" in contravention of Federal Rule of Evidence 704(a), and that it would be an opinion or inference as to defendant's mental state or condition "constituting an element of a crime charged or of a defense thereto" in contravention of Federal Rule of Evidence 704(b).[20] Id. at 4.  Finally, defendant argues that before Perry would be allowed to testify as an expert witness regarding "criminal indicators," the Court must make a finding as to his methodology under Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993). Id. at 5.

Lay witness testimony under Rule 701 is appropriate when based upon a person's observations of the events about which he is testifying.  Such testimony by a police officer may be informed by that person's background and ability to analyze a particular situation.  See, e.g., United States v. Garcia, 413 F.3d 201, 211-212 (2nd Cir. 2005).  However, when an officer's testimony goes beyond his observations of a particular situation and instead involves reliance on specialized training or on the underlying investigation in a case, he must testify as an expert witness.[21] Id. at 212.

---

19    Federal Rule of Evidence 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

20    Defendant states that his likely defense at trial is that he was unaware of the existence of contraband in the vehicle, and that Perry's testimony as to defendant's behavior would be an opinion as to that mental state. Id. at 4.

21    For instance, the Tenth Circuit has found that testimony from an officer as to his opinion that certain behaviors by defendant indicate that he was engaged in a particular criminal activity may only be given if the officer is properly qualified as an expert witness. See United States v. Banks, 262 F. App'x 900, 907-08 (10th Cir. 2008)(holding that an officer's statement that he "believe[d] that the defendant . . . was most definitely distributing illegal methamphetamine for the purpose of obtaining money" was "based on his specialized

Thus, whether Perry must testify as a lay or expert witness will depend on the exact nature of his testimony. If the government wishes to introduce Perry for the purpose only of stating what he observed at the time of defendants' arrest, his testimony will be that of a lay witness. However, if the government wishes to elicit testimony as to Perry's conclusions about defendants' behaviors in light of his years of experience, he must be properly qualified as an expert witness under Fed. R. Evid. 702. It appears that the government intends to introduce Perry as a witness to testify, "based on his training and experience . . . that there are various indicators of criminal activity associated with transporting large quantity of drugs that are discern[i]ble in a police encounter" and about "the use of hidden compartments, mules and trail cars[,] as well as cover stories and inconsistencies where criminal indicators are present." Id. Such testimony is more properly that of an expert, and Perry must be appropriately qualified.

Part of the relief sought by defendant is the exclusion of testimony by Perry as to whether defendants were aware that drugs were present, whether they had the requisite intent, or whether the defendants' behavior was evidence of guilt. Dkt. # 39. Pulido is correct that Perry may not opine on defendants' guilt or innocence, or "state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of a crime charged or of a defense thereto." See Banks, 262 F. App'x at 907-08 (statement that officer "believe[d] that the

---

training and experience," and was therefore improper lay witness testimony). Moreover, "evidence on the significance of an amount of drug is specialized," and requires expert testimony. See United States v. Sanchez-Garcia, 150 F. App'x 909, 915 (10th Cir. 2005)(unpublished). Other circuits have similarly found admissible only as expert testimony observations regarding narcotics trafficking techniques, United States v. Oriedo, 498 F.3d 593, 602-03 (7th Cir. 2007), assessments of a relationship between people based on an underlying investigation, Garcia, 413 F.3d at 212-13, and statements that a defendant's actions were "consistent with those of an experienced drug trafficker." United States v. Figueroa-Lopez, 125 F.3d 1241, 1244 (9th Cir. 1997).

defendant . . . was most definitely distributing illegal methamphetamine for the purpose of obtaining money" was an improper statement of legal conclusions regarding guilt and defendant's mental state under Rule 704); see also Fed. R. Evid. 704(b). However, it does not appear that the government is seeking to elicit testimony of that nature. Instead, Perry's proposed testimony appears to be related only to his interpretation of certain behaviors in light of his experience. Defendant is incorrect that allowing Perry to testify that certain behavior was indicative of criminal activity "is the same as allowing the trooper to testify that he could tell [d]efendant was guilty by the look on his face." Dkt. # 39, at 4. Perry may testify as to the behaviors he observed, and about the significance of those behaviors in light of his experience, without asserting any conclusions as to defendant's ultimate guilt or innocence, or defendant's mental state.

If the government intends to elicit expert testimony from Perry, it will be bound by the requirements of Fed. R. Crim. Proc. 16(a)(1)(G), which says that:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rule[] 702 . . . during its case-in-chief at trial. . . . The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

However, the requirement of Fed. R. Civ. Proc. 26(a)(2) that the expert must provide a written report does not apply. See United States v. Nacchio, 519 F.3d 1140, 1152 (10th Cir. 2008) (vacated in part on rehearing en banc by United States v. Nacchio, 555 F.3d 1234 (10th Cir. 2009), on other grounds). Moreover, although "the trial judge must perform a gatekeeping role with respect to all expert testimony . . . the reliability criteria enunciated in [Daubert] are not to be applied woodenly in all circumstances." United States v. Garza, 566 F.3d 1194, 1199 (10th Cir. 2009). Thus, an inquiry into whether officer testimony is reliable need not focus on specific studies or otherwise

tested materials, as "Rule 702 expressly contemplates that an expert may be qualified on the basis of experience." Fed. R. Evid. 702 2000 advisory committee's note. On that basis, the Tenth Circuit has consistently found that the reliability of officer testimony can be "safely inferred from the breadth of [the] individual[']s training and experience." See United States v. Diaz, 356 F. App'x 117, 126-27 (10th Cir. 2007)(unpublished)[22]; see also Garza, 566 F.3d at 1199 ("police officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on [significance of certain factors]"). Perry has sixteen years of experience with the Oklahoma Highway Patrol, and nearly thirteen years with the Special Operations Division, a criminal interdiction unit. In the course of that experience, he has received both general and advanced training at the state and federal level, and is also an instructor regarding criminal interdiction. Perry estimates that he has been involved in roughly 400 criminal interdictions, and that he has frequently come into contact with "mules," or persons who transport certain contraband for pay. Perry could be properly qualified as an expert witness on those grounds, and defendant does not appear to challenge those qualifications. Given Perry's extensive background with criminal investigations and drug interdiction, there appears to be no reason to exclude Perry's testimony as an expert at this time.

[22] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. 32.1; 10th Cir. R. 32.1.

**IT IS THEREFORE ORDERED** that defendants' motions to suppress (Dkt. ## 38, 40) are **denied**, and that defendant Pulido's motion in limine (Dkt. # 39) is **denied subject to the guidance herein**.

**DATED** this 3rd day of February, 2011.

Claire V. Eagan, Chief Judge
United States District Court for the
Northern District of Oklahoma